UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRANDON ALEXANDER
FERNANDEZ,

　　　　　　Plaintiff,

　　v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND
REHABILITATION, et al.,

　　　　　　Defendants.

No.  2:  11-cv-1125 MCE KJN P

ORDER AND FINDINGS AND
RECOMMENDATIONS

Introduction

　　　　Plaintiff is a state prisoner, proceeding through counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that he received inadequate medical care in violation of the Eighth Amendment.

　　　　Pending before the court is defendant Pomazal's motion for summary judgment.  (ECF No. 67.)  Defendant argues, in part, that he is entitled to qualified immunity.  For the following reasons, the undersigned recommends that defendant's motion be granted.[1]

---

[1]   Defendant did not notice his motion for hearing.  In his opposition, plaintiff requests that the court set a hearing.  After reviewing the relevant papers, and in light of the fact that the court heard oral argument on defendant's motion to dismiss, the undersigned has determined that oral argument would not be of material assistance in resolving the pending motion.

Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a

2

1   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

2   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

3   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

5   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

6   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

7   (9th Cir. 1987).

8         In the endeavor to establish the existence of a factual dispute, the opposing party need not

9   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

10  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

11  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

12  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

13  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

14  amendments).

15        In resolving a summary judgment motion, the court examines the pleadings, depositions,

16  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

17  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

18  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

19  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

20  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

21  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

22  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

23  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

24  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

25  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

26  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

27  ////

28  ////

3

1     <u>Legal Standard for Eighth Amendment Claims</u>

2        To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

3 plaintiff must establish that he had a serious medical need and that the defendant's response to

4 that need was deliberately indifferent. <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006); <u>see</u>

5 <u>also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). A serious medical need exists if the failure to

6 treat the condition could result in further significant injury or the unnecessary and wanton

7 infliction of pain. <u>Jett</u>, 439 F.3d at 1096. Deliberate indifference may be shown by the denial,

8 delay or intentional interference with medical treatment or by the way in which medical care is

9 provided. <u>Hutchinson v. United States</u>, 838 F.2d 390, 394 (9th Cir. 1988). To act with deliberate

10 indifference, a prison official must both be aware of facts from which the inference could be

11 drawn that a substantial risk of serious harm exists, and he must also draw the inference. <u>Farmer</u>

12 <u>v. Brennan</u>, 511 U.S. 825, 837 (1994). Thus, a defendant is liable if he knows that plaintiff faces

13 "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

14 to abate it." <u>Id.</u> at 847. "[I]t is enough that the official acted or failed to act despite his

15 knowledge of a substantial risk of serious harm." <u>Id.</u> at 842.

16        A physician need not fail to treat an inmate altogether in order to violate that inmate's

17 Eighth Amendment rights. <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir. 1989). A

18 failure to competently treat a serious medical condition, even if some treatment is prescribed, may

19 constitute deliberate indifference in a particular case. <u>Id.</u>

20        It is well established that mere differences of opinion concerning the appropriate treatment

21 cannot be the basis of an Eighth Amendment violation. <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332

22 (9th Cir. 1996); <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981).

23     <u>Legal Standard for Qualified Immunity</u>

24        In analyzing a claim of qualified immunity, a court must examine: (1) whether the facts

25 as alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct

26 violated a constitutional right; and (2) if a constitutional right was violated, whether, "in light of

27 the specific context of the case," the constitutional right was so clearly established that a

28 reasonable official would understand that what he or she was doing violated that right. <u>See</u>

4

1    Saucier v. Katz, 533 U.S. 194, 201–02 (2001).  If no constitutional right was violated, the inquiry

2  ends and the defendant prevails.  Saucier, 533 U.S. at 201.

3        To meet the "clearly established" requirement, "[t]he contours of the right must be

4  sufficiently clear that a reasonable official would understand that what he is doing violates that

5  right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

6  allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

7  "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

8  reasonableness is judged against the backdrop of the law at the time of the conduct."  Brosseau v.

9  Haugen, 543 U.S. 194, 198 (2004).

10        Courts are not required to address the two inquiries in any particular order.  Rather, courts

11  may "exercise their sound discretion in deciding which of the two prongs of the qualified

12  immunity analysis should be addressed first in light of the circumstances in the particular case at

13  hand."  Pearson v. Callahan, 555 U.S. 223, 243 (2009).

14  Plaintiff's Factual Allegations

15        This action is proceeding on the second amended complaint filed April 17, 2013.  (ECF

16  No. 34.)  The undersigned herein sets forth plaintiff's relevant factual allegations.

17        In June 2009, plaintiff was housed at the California Correctional Center ("CCC").  (Id. at

18  3.)  Defendant Pomazal is the Chief Medical Officer ("CMO") at CCC.[2]  On June 7, 2009,

19  plaintiff injured his left ring finger while playing basketball on the CCC yard.  (Id.)  Plaintiff

20  attempted to seek medical attention for his finger but was told by CCC yard medical staff that

21  they were closed for the day and to "come back tomorrow."  (Id.)

22        On Monday June 8, 2009, plaintiff arrived at the medical window and explained his

23  problem to defendant Doe 1, an over-weight, white male Medical Technical Assistant ("MTA").

24  (Id.)  The MTA told plaintiff that he had to fill out a Medical Request Form 7362.  (Id.)  Plaintiff

25  filed out the form and was told to wait in the waiting room.  (Id.)  Plaintiff waited all day but was

26  eventually told that he would not be seen and to go back to his building and wait for a "Medical

27      _____

28  [2]  The second amended complaint incorrectly states that defendant Pomazal is the Chief Medical Officer at High Desert State Prison.  (Id.)

1  Ducat." (Id.)

2      After 11 days without a response, plaintiff returned to the medical window and was

3  informed by medical staff that they had lost the Medical Request Form 7362 he had filed on June

4  8, 2009. (Id.)  Plaintiff filled out a new Form 7362 and was again told to wait for a medical

5  ducat. (Id.)

6      On plaintiff's second Form 7362, prepared June 19, 2009, no one documented the date

7  and time received and no one identified who the form was received by as required in Part II of the

8  form. (Id.)  Defendant Doe 2, who received the form, failed to acknowledge receipt, as required

9  on the form. (Id.)  Defendant Doe 3 "processed" the form by erroneously marking the "routine"

10  box, indicating the issue could be dealt with within 14 calendar days, despite plaintiff stating on

11  the form that he was in severe pain and had likely suffered a broken finger. (Id. at 3-4.)

12  Defendant Doe 3 also failed to complete any of the substantive information to be completed by

13  the triage nurse. (Id. at 4.)  Either Defendant Doe 3 or another unknown prison employee later

14  wrote "7-9" on Part II of the form, indicating that plaintiff would not be scheduled to see a doctor

15  until July 9, 2009. (Id.)

16      Two weeks later, plaintiff was ducated for medical treatment. (Id.)  Plaintiff was

17  informed that he had not been ducated earlier because the staff marked the Medical Request as

18  "routine" and because they felt his injury was not "life threatening." (Id.)

19      On July 10, 2009, three weeks after he had filed his second Form 7362, plaintiff saw a

20  doctor for the first time. (Id.)  Noting that plaintiff's finger looked swollen and suspecting

21  something was definitely wrong with it, the doctor scheduled plaintiff for x-rays. (Id.)

22      On July 15, 2009, plaintiff's finger was x-rayed, showing a fresh break in the finger that

23  had partially healed. (Id.)  The doctor informed plaintiff that the finger had already begun to heal

24  and that because of the delay in treatment, there was nothing the doctor could do to help the

25  finger heal correctly. (Id.)  Plaintiff continued to suffer severe pain and requested pain

26  medication. (Id.)  The doctor denied plaintiff's request, and told plaintiff he would send him to

27  an orthopedist for further examination. (Id.)

28  ////

1    On July 28, 2009, plaintiff was sent to the CCC "Sierra" yard for an Ortho consultation.

2    (Id.)  The orthopedist informed him that he may need surgery and that he would send plaintiff to a

3    specialist in Reno, Nevada.  (Id.)  Again, plaintiff was denied pain medication and received no

4    splint, wiring or cast to immobilize his finger.  (Id.)

5    On August 27, 2009, after receiving no updates regarding his treatment, plaintiff filed a

6    third Form 7362 asking for the status of his treatment.  (Id.)  Defendant Doe indicated "08/28/09,"

7    but no time in the "Date/Time Received" section of the form.  (Id.)  Defendant Doe further failed

8    to complete any substantive information to be completed by the triage nurse, and simply marked

9    the "routine" box on the form.  (Id. at 5.)

10    Subsequently, plaintiff was transferred to High Desert State Prison ("HDSP") where he

11    received treatment for his finger and medicine for pain management.  (Id.)  On October 27, 2009,

12    plaintiff saw a doctor who told him his finger could not be operated on because of how it healed.

13    (Id.)  Plaintiff also learned that his finger would be permanently disfigured.  (Id.)

14    Clarification of Plaintiff's Legal Claims Against Defendant Pomazal

15    The undersigned herein clarifies plaintiff's legal claims against defendant Pomazal.

16    Because these claims are not a model of clarity, a lengthy discussion of the case history is

17    required.

18    On April 27, 2011, plaintiff filed the original complaint in pro se.  (ECF No. 1.)  On

19    September 27, 2011, the complaint was dismissed with leave to amend.  (ECF No. 5.)  On July

20    13, 2011, plaintiff, proceeding pro se, filed a first amended complaint.  (ECF No. 8.)  The

21    allegations in the first amended complaint are similar to those contained in the second amended

22    complaint.  On January 3, 2012, the court ordered service on defendants Barnes, Cate and

23    Pomazal. (ECF No. 9.)

24    On April 9, 2012, defendants Barnes, Cate and Pomazal filed a motion to dismiss.  (ECF

25    No. 16.)  In relevant part, defendants argued that plaintiff had not stated a colorable Eighth

26    Amendment claim against defendants Cate and Barnes because he did not adequately allege their

27    personal involvement.  (ECF No. 16-1 at 2.)  Defendants also moved to dismiss plaintiff's request

28    for damages against defendants in their official capacities.  (Id.)

7

1        On January 24, 2013, Magistrate Judge Moulds recommended that defendants' motion be

2   granted.  (ECF No. 26.)  Judge Moulds recommended that defendants Barnes and Cate be

3   dismissed because plaintiff had failed to allege their involvement under theories of direct or

4   supervisory liability.  (Id.)  Judge Moulds also recommended that plaintiff's request for damages

5   against defendants in their official capacities be dismissed.  (Id.)

6        On January 28, 2013, Judge Moulds appointed present counsel to represent plaintiff.

7   (ECF No. 27.)

8        On March 28, 2013, the Honorable Morrison C. England adopted the January 24, 2013

9   findings and recommendations, but granted plaintiff leave to amend as to his claims against

10  defendants Cate and Barnes.  (ECF No. 33.)

11       On April 17, 2013, plaintiff, proceeding through counsel, filed the second amended

12  complaint.  (ECF No. 34.)  Plaintiff's second amended complaint contains two causes of action

13  against defendant Pomazal.  In the first cause of action, plaintiff alleges that defendant Pomazal

14  acted with deliberate indifference to his serous medical needs by not allowing him to see a

15  physician until more than one month after he suffered an injury to his finger, "despite having filed

16  three separate 7362 Requests for consultation shortly after he suffered the injury."  (Id. at 5.)

17       Plaintiff's second cause of action is labeled "Supervisory Liability."  (Id. at 6.)  This

18  cause of action also includes claims against previously dismissed defendants Cate and Barnes:

> 28.  Defendants Cate, Barnes and Pomazal were acting under color
> of law when their actions resulted in the denial and delay of
> adequate medical care for Plaintiff.
>
> 29.   Defendants were liable under the doctrine of supervisory
> liability when they failed to provide Plaintiff with proper medical
> care, resulting in a violation of Plaintiff's U.S. Constitutional right
> to be free from cruel and unusual punishment.  Defendants knew or
> reasonably should have known that medical staff at CCC were not
> providing adequate medical care and that this would deprive
> Plaintiff of his Eighth Amendment rights yet did nothing to cure the
> problem.
>
> 30.  Defendant Cate, as Director of CDCR, was responsible for the
> operations of CDCR and for the welfare of all inmates.
>
> 31.   Defendant Cate had direct knowledge that prisons were
> overcrowded and that this overcrowding led to inmates not being
> seen by medical staff in a timely manner and that inmates suffered

8

injuries as a result of this delay in treatment.  Defendant Cate knew that CDCR medical system was not providing adequate medical care and that this was depriving inmates of their Eighth Amendment right against cruel and unusual punishment yet he did nothing to fix the system.

32.   An October 2009 audit of CCC's medical care system conducted by the Office of the Inspector General revealed some deficiencies in how the facility handled inmate medical requests.  The extent of Plaintiff's injuries was directly caused by the delay in his treatment.

33.   An August 2012 audit conducted by the Inspector General showed that CCC had remedied these deficiencies and had now reached full compliance.  If Plaintiff had been seen in a timely manner, he could have received the treatment he needed and his finger would not be permanently disfigured.

34.   Defendant Barnes, as Warden of CCC, was responsible for the operations of CCC and for the welfare of the inmates in CCC.

35.   Defendant Barnes, by not overseeing a competent medical staff or implementing a medical scheduling system that guaranteed inmates receive medical care in a timely manner, failed to provide a facility that could provide adequate medical care to its inmates and set into motion a series of acts that he knew or reasonably should have known would result in the deprivation of Plaintiff's Eighth Amendment rights.

36.   *Defendant Pomazal, as CMO, is responsible for the authorization and scheduling of inmate health care request forms and for medical care at Susanville prisons.*

37.   *Under the program implemented by Defendant Barnes for medical scheduling, Defendant Pomazal had the authority to approve or deny requests for medical consultation.  As Plaintiff was forced to wait for Defendant Pomazal's approval, his initial 7362 Request was lost and it took another two weeks after Plaintiff filed a new 7362 Request for him to finally get approval to see a doctor and an additional week after that for him to actually see a doctor.*

(ECF No. 34 at 6-7 (emphasis added).)

On March 13, 2013, defendants Barnes, Cate and Pomazal filed an answer to the second amended complaint.  (ECF No. 34.)

On May 29, 2013, defendants Barnes and Cate filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 37.)  Defendants argued that plaintiff failed to allege their personal involvement in any alleged deprivation and failed to state colorable Eighth Amendment claims against them.  (ECF No. 37-1.)

9

On July 31, 2013, the undersigned recommended that defendants' motion to dismiss be granted. (ECF No. 45.) On September 3, 2013, Judge England adopted the findings and recommendations. (ECF No. 48.)

On December 9, 2013, non-party California Department of Corrections and Rehabilitation ("CDCR") filed a motion to quash subpoenas issued by plaintiff which sought the production of, *inter alia*, 602 inmate appeals forms related to the processing of medical forms. (ECF No. 52.) Plaintiff argued that the forms were relevant to his second amended complaint against defendant Pomazal because his "*legal theory rests on establishing that the procedures instigated to process 7362 forms were so flawed that it created significant delay in his receiving medical care.*" (ECF No. 56 at 4 (emphasis added).) On February 27, 2014, the undersigned issued an order granting the motion to quash. (ECF No. 59.) In that regard, the undersigned found that the documents plaintiff sought were not relevant to the subject matter of this action:

> Contrary to plaintiff's position, the court finds that the second amended complaint *does not* allege that defendant Pomazal "failed to administer an efficient medical system" or established "procedures instigated to process 7362 forms." Opposition at 3, 4. The second amended complaint alleges that *defendant Barnes*, "by not overseeing a competent medical staff or implementing a medical scheduling system that guaranteed inmates receive medical care in a timely manner, failed to provide a facility that could provide adequate medical care to its inmates." Second Amended Complaint, para. 35. However, the claims against defendant Barnes were dismissed by the court. ECF Nos. 45, 48. With regard to defendant Pomazal, plaintiff merely claims that he is responsible for the authorization and scheduling of inmate health care request forms "[u]nder the program implemented by defendant Barnes." [Second Amended Complaint] Para. 36-37. *Here, plaintiff's claims against defendant Pomazal rest on whether defendant Pomazal was indifferent to his serious medical needs and whether he failed to timely authorize plaintiff's medical examination.*
>
> Considering the nature of the action, inmate grievances regarding improperly filled out or lost medical request forms would not serve to *establish that defendant Pomazal should be held liable to plaintiff because he was indifferent to plaintiff's serious medical needs or that he failed to timely authorize and schedule plaintiff's medical examination*.

Id. at 6 (emphasis added).

On March 6, 2014, plaintiff filed a motion for leave to file an amended complaint in order to clarify the factual basis supporting his supervisory claims against Pomazal. (ECF No. 60.)

10

Plaintiff contended that the order quashing the subpoenas was the first indication to plaintiff that the pleadings, as stated, were insufficient to support a supervisory claim against defendant Pomazal.  (Id. at 4.)  The proposed third amended complaint included the following new allegations in support of the supervisory liability claim against defendant Pomazal:

> 27.   Defendant was liable under the doctrine of supervisory liability when he failed to provide Plaintiff with proper medical care, resulting in a violation of Plaintiff's U.S. Constitutional right to be free from cruel and unusual punishment.  Defendant knew or reasonably should have known that the medical staff under his supervision and control at CCC were not providing adequate medical care to inmates during the year of 2009 and Defendant failed to take action to correct these failures in medical treatment provided at CCC.

> 28.   An October 2009 audit of CCC's medical care system conducted by the Office of the Inspector General revealed deficiencies in how the facility provided medical care throughout the year of 2009.  Medical forms were routinely improperly filled out or lost.  The extent of Plaintiff's injury was directly caused by the delay in his medical treatment, due to the improper processing of his medical request forms.   These improper processing procedures were known or should have been known to defendant Pomazal and he failed to take action to correct them prior to the OIG report of October 2009.

> 29.  An August 2012 audit conducted by the Inspector General showed that CCC had remedied these deficiencies and had now reached full compliance.  If Plaintiff had been seen in a timely manner, he could have received the treatments he needed and his finger would not be permanently disfigured.

> 30.  Defendant Pomazal, as CMF and HCM, was responsible for the training and supervision, and control of the health care system at California Correctional Center.  He knew or reasonably should have known about the pattern of improper medical treatment being provided in 2009 and did not take steps to end this program.

> 31.  Under the program implemented at CCC for medical treatment scheduling, Defendant Pomazal had the authority to approve or deny requests for medical consultation.  As plaintiff was forced to wait for Defendant Pomazal's approval, his initial 7362 Request was lost and it took another two weeks after Plaintiff filed a new 7362 Request for him to finally get approval to see a doctor and an additional week after that for him to actually see a doctor.

(ECF No. 60-1 at 6-7.)

On April 9, 2014, the undersigned recommended that plaintiff's motion to amend be denied.  (ECF No. 65.)  The findings and recommendations discuss plaintiff's prior claims against

11

1    defendant Pomazal:

2          While plaintiff argues that he was only recently informed that the
           pleadings were insufficient, as noted above, "carelessness is not
3          compatible with a finding of diligence." Johnson, 975 F.2d at 609.
           Here, the court notes that plaintiff was put on notice of defendants'
4          characterization of his allegations against defendant in his first
           motion to dismiss, filed on April 9, 2012.   (ECF No. 16-1.)
5          Therein, defendant summarized plaintiff's allegations as follows:

6                Pomazal was responsible for making sure that Health Care
                 Services Request forms were processed.  (FAC, ECF No. 8
7                at 8.)  Pomazal lost Fernandez's first Health Care Services
                 Request Form.    (FAC, ECF No. 8 at 8.)    Pomazal
8                purposefully, but for unknown reasons, delayed the
                 processing of Fernandez's second Health Care Services
9                Request form for weeks.  (FAC, ECF No. 8 at 8.)  Because
                 of Pomazal's actions, Fernandez did not receive immediate
10               medical attention and Fernandez became disfigured and
                 suffered extreme pain.  (FAC, ECF No. 8 at 8.)
11
           Id. at 4.   The motion to dismiss sought dismissal of, inter alia,
12         plaintiff's supervisory claims against defendants Barnes and Cate.
           In its findings and recommendations in the first motion to dismiss,
13         the court stated that plaintiff claims defendant Pomazal "was
           directly responsible for ensuring that plaintiff's medical request
14         forms were processed and not lost." (ECF No. 26 at 2.)  The court
           recommended dismissal of plaintiff's supervisory claims against
15         defendants Barnes and Cate.  Id.  The district judge assigned to the
           action adopted the findings and recommendations and plaintiff was
16         granted final leave to amend his allegations against defendants
           Barnes and Cate.   (ECF No. 33.)   Plaintiff filed an amended
17         complaint on April 17, 2013.  With regard to defendant Pomazal,
           the allegations in the second amended complaint are similar to
18         those in the first amended complaint, but with some elaboration on
           defendant's responsibility for the processing of medical forms
19         under the program implemented by defendant Barnes.  Compare
           ECF No. 8 at 8 (alleging that defendant was directly responsible for
20         making sure medical forms were processed), with, ECF No. 34 at 5,
           7 ("Under the program implemented by Defendant Barnes for
21         medical treatment scheduling, Defendant Pomazal had the
           authority to approve or deny requests for medical consultation.")
22         Now, plaintiff seeks to amend his complaint to include the
           allegation that defendant Pomazal "was responsible for the training,
23         supervision and control of medical care at CCC." (ECF No. 60-1 at
           2-3.)
24

25   (ECF No. 65 at 6 (emphasis added).)

26         The undersigned found that plaintiff lacked the requisite diligence in seeking to amend his

27   complaint.  (Id. at 7.)  On July 9, 2014, Judge England adopted the findings and recommendations

28   recommending that plaintiff's motion to amend be denied.  (ECF No. 70.)

1      The discussion above makes clear that plaintiff's second cause of action is really no

2   different than his first cause of action.  In both, plaintiff alleges that defendant Pomazal failed to

3   timely authorize and schedule plaintiff's requests for medical consultations in June and July 2009.

4   Plaintiff is *not* proceeding on theories that defendant Pomazal was responsible for the training,

5   supervision and control of medical care at CCC.

6   Undisputed Facts

7      Defendant does not appear to dispute the factual allegations set forth in the second

8   amended complaint regarding plaintiff's injuries and the processing of his 7362.  Defendant's

9   statement of undisputed facts focuses on the CCC policies regarding his job duties as well as the

10  CCC policies for the processing of 7362 Forms.  The undersigned sets forth those undisputed

11  facts herein.  To the extent there are material disputes, the undersigned notes them below.

12     In June 2009, defendant Pomazal was the CMO at CCC.  (ECF No. 67-12 at 7.)  As the

13  CMO, defendant Pomazal provided clinical management, supervision and leadership to other

14  medical clinicians at CCC, and supervised the delivery of health care to inmates housed at CCC.

15  (Id.)

16     Defendant Pomazal did not treat plaintiff in a clinical setting for any complaints related to

17  his fractured left ring finger.  (Id. at 10.)

18     Defendant Pomazal was not presented with a CDCR form 7362 Health Care Request

19  Form concerning plaintiff in June or July 2009.  (Id. at 9.)

20     Defendant Pomazal's direct involvement in plaintiff's care was limited to approving

21  medical appointments with orthopedic specialists at Reno Orthopedics.  (Id. at 10.)  On

22  September 25, 2009, defendant Pomazal approved an appointment for plaintiff with an orthopedic

23  specialist at Reno Orthopedics for October 26, 2009.  (Id.)  On November 23, 2009, defendant

24  Pomazal approved an appointment for plaintiff with an orthopedic specialist at Reno Orthopedics

25  scheduled for January 15, 2010.  (Id.)  Defendant Pomazal did not deny any Requests for Services

26  concerning plaintiff.  (Id.)

27     As of June 1, 2009, a procedure existed at CCC for an inmate at CCC to obtain primary

28  medical care.  (Id. at 1.)  This procedure required the inmate to complete a CDCR form 7362

13

1    Health Care Services Request ("Request") and to submit the request at a designated location at

2    CCC. [3] (Id. at 1-2.)

3           A member of the health care staff at CCC would collect the Requests each day and deliver

4    them to the clinic at CCC, which was staffed during normal working hours by a Registered Nurse

5    ("RN"), an MTA, and one Physician and Surgeon or a Nurse Practitioner.[4]  (Id. at 7-8.)  The

6    procedure was for either the RN or MTA to initial and date each Request upon receipt.  (Id. at 8.)

7           The parties dispute the amount of time in which the Requests were to be reviewed.

8    According to defendant, each request was to be reviewed each regular business day by the RN to

9    establish medical priorities on an emergent or non-emergent basis.  (Id. at 2.)  Plaintiff has

10   submitted the deposition of Nurse Ladista, who states that her training indicated that she had 48

11   hours to respond to a Request.  (ECF No. 71-3 at 8.)

12          During normal working hours, inmates with an emergent request would be seen

13   immediately by an RN, mental health clinician, or dentist, as appropriate, in order to determine

14   the next level of care to be provided.  (ECF No. 67-2 at 2.)

15          An inmate with a non-emergent request would be seen by an RN by the end of the

16   following business day for a face-to-face triage examination.[5]  (Id.)  During the face-to-face

17

18   [3]  Plaintiff disputes that the request had to be submitted at one location because defendant
     Pomazal testified at his deposition that there were "boxes" indicating more than one location.  It
19   does not appear to the undersigned that defendant is claiming, in the statement of undisputed
     facts, that there was only one location for the forms to be submitted.
20
21   [4]  Plaintiff alleges that at his deposition, defendant Pomazal testified that after normal business
     hours during the week, as well as on weekends and holidays, the physician would not actually be
22   present but would be "on call."

23   [5]  Plaintiff disputes this undisputed fact, and cites defendant Pomazal's deposition testimony
     where he stated that "it would depend upon the extent of the non-emergent complaint" and that
24   "it's difficult to put black and white time frames on these" because "medicine is not black and
     white."  (Plaintiff's opposition, ECF No. 71-1 at 4 citing Pomazal deposition at 54: 22-23; 55: 9.)
25   The undersigned has reviewed the portion of defendant Pomazal's deposition transcript cited by
     plaintiff.  While plaintiff appears to suggest that defendant Pomazal testified that he could not
26   give a time frame for when non-emergent complaints would be reviewed, he actually testified that
     an inmate with non-emergent complaints that an RN feels is of high concern may actually be seen
27   sooner.  (ECF No. 71-4 at 16-17.)  For this reason, defendant Pomazal testified that medicine is
     not "black and white."
28

1 | triage, the RN then would determine if a physician referral was necessary, and the time frame in

2 | which the inmate was to be seen by the physician.  (Id. at 2-3.)

3 |    An inmate determined to have a medical emergency would be seen by a physician

4 | immediately, an inmate with an urgent medical condition would be seen by a physician within

5 | twenty-four hours, and an inmate with a routine medical condition would be seen by a physician

6 | within fourteen days.  (Id. at 3.)

7 |    On weekends and holidays, the CCC procedure was for the RN to review the Request and

8 | would contact the physician, mental health clinician or dentist on call concerning an inmate with

9 | an emergent or urgent request.  (Id.)  On weekends and holidays, the CCC procedure was for

10 | inmates with routine health care needs to be seen by an RN on the next business day.  (Id.)

11 |    As of June 1, 2009, the CCC procedure was that an inmate with an urgent/emergent health

12 | care request, which is a request for medical attention based on the inmate's belief that a medical

13 | condition, symptom, or sign requiring immediate medical attention, could request medical

14 | attention from any CDCR employee, who was required to notify medical staff.  (Id.)  The inmate

15 | then would be brought to a medical clinic, or a Triage and Treatment Area ("TTA"), or would be

16 | put into contact with a physician or nurse for a telephone triage.  (Id.)  If the inmate was

17 | physically present at the clinic or TTA, a nurse or physician on duty would either examine the

18 | inmate, or would instruct an MTA to obtain vital signs and other clinical data from an inmate, and

19 | to report back with this information.  (Id.)  The nurse or physician on duty then would review the

20 | information, and personally examine the inmate.  (Id.)  On evenings and weekends, the physician

21 | on call would attend to the patient in person or determine through telephone contact with nursing

22 | staff the level of care to be provided.  (Id.)  The inmate might be taken to a community hospital,

23 | or an appointment with a primary care physician would be scheduled, if appropriate.  (Id.)

24 |    An inmate could also proceed directly to a medical clinic or TTA with an urgent/emergent

25 | medical health care request.  (Id.)  A nurse or physician on duty would either examine the inmate,

26 | or instruct an MTA to obtain vital signs and other clinical data from the inmate, and to report

27 | back this information.  (Id.)  The nurse or physician on duty then would review the information

28 | and personally examine the inmate to determine the next level of care to be provided.  (Id.)  An

appointment with a primary care physician would be scheduled if appropriate.  (Id.)

In cases where the triage examination was conducted by an RN, the Physician and Surgeon relied on the medical judgment of the RN as to whether an inmate had an emergency, urgent or routine medical condition.  (Id. at 4.)

At CCC, the procedure was for when a physician examined an inmate and believed that a referral to a specialist was appropriate, the physician would fill out a Physician Request for Services form CDC 7243, which is distinct and different from the Health Care Services Request Form CDC 7263.  (Id.)  The form 7243 filled out by the attending physician would go to the Chief Physician and Surgeon, Chief Medical Executive or designee for review to authorize the requested service or deny the request if there was no apparent medical necessity for the requested service.  (Id.)  The treating physician/requesting physician is notified when his/her request for services is denied after evaluation by the Chief Physician or designee.  (Id.)  The treating/requesting physician may respond in a number of ways.  (Id.)  First, he/she may acknowledge the wisdom of the denial and inform the patient why a requested service will not be done at this time.  (Id.)  Second, the physician may resubmit the request and/or discuss the request with the Chief Physician and provide a more detailed explanation as to why he/she believes the service is necessary.  (Id.)  Third, the physician can ask his/her colleagues to consider the matter in a committee meeting, usually the Medical Authorization Review ("MAR") Committee.  (Id.)  In any case, the determination as to whether or not to let the denial stand is made by the Primary Care Physician.  (Id.)

As of June 1, 2009, defendant Pomazal was unaware of any situations where an inmate at CCC had presented a Health Care Service Request form 7362 to a member of the health care staff at CCC and claimed that the health care staff had lost the request.  (Id.)

Discussion

Defendant makes the following arguments in support of his motion for summary judgment: 1) he did not personally participate in any deprivation of medical services for plaintiff; 2) he cannot be held vicariously liable under a theory of respondeat superior; 3) he is not liable under a supervisory theory; 4) he is entitled to qualified immunity; and 5) in the alternative, he is

16

1  entitled to summary judgment concerning the prayer for punitive damages.

2          As discussed above, although plaintiff's second amended complaint includes claims

3  alleging personal and supervisory liability, in both claims plaintiff alleges that defendant failed to

4  timely authorize and schedule his requests for medical consultations.  The section of defendant's

5  summary judgment motion alleging that defendant did not personally participate in any alleged

6  deprivation addresses this claim:

> Fernandez erroneously contends that Dr. Pomazal failed to approve
> treatment for Fernandez when Fernandez initially submitted a
> CDCR form 7362, Health Care Service Request, causing the form
> to be lost.  Under the system in place at CCC as of June 1, 2009,
> Dr. Pomazal's approval as the CMO at CCC was not required for an
> inmate to be examined by a primary care physician.  (DUF Nos. 7,
> 8 and 9.)  Rather, appointments with a primary care physician at
> CCC were scheduled after a triage examination conducted by a
> nurse or a physician on duty.  (DUF Nos. 7, 8 and 9.)  Dr. Pomazal
> was not presented with a CDCR form 7362, Health Care Service
> Request concerning inmate Fernandez in June 2009 or July 2009,
> and did not take any steps to deny or delay medical care for inmate
> Fernandez.  (DUF No. 5.)

> As Dr. Pomazal did not personally participate in a violation of
> Fernandez's constitutional rights, Dr. Pomazal cannot be held liable
> under 42 U.S.C. section 1983.

16  (ECF No. 67-1 at 7.)

17          Defendant goes on to argue that he is entitled to summary judgment under a supervisory

18  theory:

> To state a claim for relief under section 1983 for supervisory
> liability, a plaintiff must allege some facts indicating that a
> defendant either (1) personally participated in the alleged
> deprivation of constitutional rights; (2) knew of the alleged
> violations and failed to act to prevent them; or (3) promulgated or
> "implemented a policy so deficient that the policy itself is a
> repudiation of constitutional rights and is the moving force of the
> constitutional violation."  Hansen v. Black, 885 F.2d 642, 646 (9th
> Cir. 1989) (internal citations omitted).  An individual's general
> responsibility for supervising the operations of a prison is
> insufficient to establish personal involvement for purposes of
> asserting a claim under 42 U.S.C. § 1983.  Wesley v. Davis, 333
> F.Supp.2d 888, 892 (C.D. Cal. 2004.)

> In this case, there is no evidence that Dr. Pomazal personally
> participated in any deprivation of Fernandez's constitutional rights,
> as Dr. Pomazal did not treat Fernandez in a clinical setting and
> promptly approved all requests for consultations with outside
> orthopedists.  (DUF Nos. 4, 5 and 6.)  Additionally, Dr. Pomazal

was unaware of any other prior instances where an inmate at CCC had presented a HealthCare Service Request form 7362 to a member of a health care staff at CCC and claimed that the health care staff had lost the Request. (DUF No. 12.) Finally, a policy and procedure was in place at CCC as of June 1, 2009, to provide medical care to inmates which, if properly utilized by the health care staff at CCC, would ensure that medical complaints submitted by inmates were promptly and appropriately evaluated. (DUF Nos. 7, 8, 9, 10 and 11.) As noted above, Fernandez's complaints concerning the evaluation of his injury, such as losing a CDCR form 7362, Health Care Service Request, or not properly completing the form, actually involve alleged negligence by other health care personnel responsible for implementing the policies and procedures at CCC, rather than a failure of policies and procedures themselves. Therefore, Dr. Pomazal cannot be held liable under 42 U.S.C section 1983 as the CMO at CCC under a theory of supervisory liability.

(Id. at 7-8.)

In the opposition, plaintiff states that he is not alleging that defendant personally participated in any deprivation of medical services or is liable based on the theory of respondeat superior. (ECF No. 71 at 3-4.) Plaintiff does not dispute that defendant did not treat him in a clinical setting for any complaints regarding his fractured finger. Plaintiff also does not dispute that defendant was not presented with a CDCR form 7362 Health Care Request Form for plaintiff in June or July 2009. Plaintiff also does not allege that defendant, as the CMO, was involved in the initial processing of the CDCR form 7362 Health Care Request Forms. Instead, in the opposition, plaintiff alleges that he is basing defendant's liability on a theory of supervisory liability. Plaintiff argues:

There is strong circumstantial evidence of Pomazal's deliberate indifference to the lack of timeliness in prisoners obtaining medical care prior to June 2009. Pomazal was aware of problems in the timeliness that patients were being seen and claims he worked to correct those problems prior to June 2009. However, he was not successful in making effective changes as evidence by the audit results of just over 65 % of clinical services.

Pomazal protested that the OIG was wrong to characterize him as being responsible for CCC's entire health care program. Pomazal depo. at 100.

I wish in the bureaucracy that that were true. There are so many people from headquarters and throughout the entire organization that have input into the functioning of our institution, but that somewhat waters down that statement.

18

Id. at 100.  Unlike Harry Truman, the buck "did not stop on [Pomazal's] desk," according to Pomazal.  Id. at 101.  "[T]he headquarters people, especially in the nursing program, would run the nurses and all their programs."  Id.  Pomazal testified that he never had the authority to terminate or reassign people "and over nursing staff it was extremely limited."  Id. at 102.  He said that he would try to correct situations such as what happened to Plaintiff "if I knew about them.  And that would be through negotiation with nursing staff and other staff members and with headquarters."  Id. at 101-02.

It started out as I had a bit more authority over the nurses.  But as headquarters took over more of that responsibility, I had less and less authority over the nurses.

Id. at 103.  If any nurses were disciplined during Pomazal's time at CCC he was not aware of it.  Id. at 105-06.

Pomazal identified for the first time at his deposition "Jane Robinson out of headquarters" who was either the Northern Regional Nursing Administrator or the Chief Nurse and Glen Thiel, Northern Regional Medical Director, as individuals who had authority and therefore direct responsibility over the nurses.  Id. at 102-04.

This information suggests that "headquarters" was taking over responsibility over nursing care for Pomazal, which is circumstantial evidence that his supervision of the nursing staff was inadequate.  This is further circumstantial evidence of the state of mind required for supervisory liability in this situation, creating a disputed material fact issue regarding Pomazal's liability.

(ECF No. 71 at 5-6.)

As noted above, the court denied plaintiff's motion for leave to file a third amended complaint including allegations that defendant Pomazal "was responsible for the training, supervision and control of medical care at CCC."  (ECF No. 60-1 at 2-3 (proposed third amended complaint.)  In his opposition to defendant's summary judgment motion, plaintiff argues that defendant Pomazal is liable based on his alleged inadequate supervision, training and control of medical care at CCC.  Because plaintiff's request to proceed on this theory of liability was denied, these arguments are disregarded.

In his opposition, plaintiff also references the 2009 OIG report, discussed by defendant in the section of his motion arguing for qualified immunity.  Plaintiff argues that this report demonstrated that defendant was aware in June 2009 of deficiencies in the delivery of health care of the type suffered by plaintiff.  As noted above, plaintiff is not proceeding on a theory that

1    defendant Pomazal failed to administer an efficient medical system or established procedures

2    instigated to process 7362 forms.  While the second amended complaint made these claims

3    against defendant Barnes, these claims were dismissed.  (See ECF No. 56 (order addressing

4    motion to quash).)  Consequently, the OIG report addressing deficiencies in the delivery of health

5    care is not relevant to the theories on which this action is proceeding against defendant Pomazal.[6]

6              In the opposition, plaintiff indicates that he is not proceeding on the legal theory on which

7    the undersigned has found, in several orders, that this action is proceeding, i.e., defendant failed

8    to timely authorize and schedule plaintiff's requests for medical consultations.  Instead, plaintiff's

9    opposition focuses on legal theories on which this action is not proceeding, i.e., defendant was

10   responsible for the training, supervision and control of medical care at CCC.[7]  Because plaintiff,

11   in essence, concedes that defendant is not liable on the theory on which this action is proceeding,

12   defendant should be granted summary judgment.  Because the undersigned finds that defendant is

13   entitled to summary judgment as to the merits of plaintiff's claims, the undersigned does not

14   address defendant's remaining arguments that he is entitled to summary judgment based on

15   qualified immunity and concerning the prayer for punitive damages.[8]

16   _____

17   [6]  Plaintiff argues that the OIG report gave CCC a weighted score of 65.9% for clinical services,
     the category that relates to the timeliness of seeing patients and processing sick call requests like

18   the 7362 forms that were a major problem in plaintiff obtaining proper and timely medical care.
     (ECF No. 71 at 3.)  A copy of the OIG report is attached as an exhibit to plaintiff's opposition.

19   (ECF No. 71-6.)  Plaintiff is correct that Clinical Services received an overall score of 65.9 %.
     (Id. at 4.)  A closer review of the report reveals that several sub sections of the Clinical Services

20   survey addressing the processing of inmate health care requests received higher individual scores.
     For example, the question of whether an inmate's request for health care got reviewed the same

21   day it was received was given a score of 80%.  (Id. at 12.)  The question of whether the RN
     completed the face to face triage within one business day after the form 7362 was reviewed was

22   given a score of 84 %.  (Id.)  The question of whether the RN's plan included an adequate strategy
     to address the problems identified during the face-to-face triage was given a score of 89.5 %.

23   (Id.)

24
     [7]  Because plaintiff's second claim for relief is labeled "supervisory liability," the undersigned

25   understands why defendant moved for summary judgment on this legal theory, although it was
     previously clarified that plaintiff was not proceeding on such a claim.

26
     [8]  As to the "doe" defendants whom plaintiff alleges misplaced his first 7362 Form and checked

27   the non-urgent box on his later submitted 7362 form, plaintiff states at most a claim for
     negligence.  (See ECF No. 67-1 at 7-8.)  Negligence or a negligent act by a person acting under

28

1    Motion to Amend

2         In his August 4, 2014 opposition, plaintiff requests leave to file a third amended complaint

3    naming as new defendants Chief Nurse Jane Robinson and Glen Thiel, Northern Regional

4    Medical Director.  Plaintiff alleges that at his July 1, 2014 deposition, defendant identified these

5    individuals who had authority and therefore direct responsibility over the nurses who allegedly

6    failed to properly process his 7362 forms.  Plaintiff alleges that neither Robinson nor Thiel were

7    identified in response to plaintiff's previous discovery requests.

8         In the reply to plaintiff's opposition, defendant opposes plaintiff's request for leave to

9    amend.

10        Significantly, plaintiff did not and has not filed a motion for leave to amend or a proposed

11   amended complaint.  Plaintiff does not indicate why he has not done so.  Moreover, plaintiff's

12   counsel does not seem to recognize that the time for pleadings and discovery has closed.  Instead,

13   plaintiff seems to take the position that the court should give an advisory ruling regarding his

14   request for leave to amend in these findings and recommendation addressing defendant's

15   summary judgment motion.  Plaintiff indicates that he will file an amended complaint only if the

16   court grants defendant's summary judgment motion.

17        In light of the foregoing, the undersigned hereby ORDERS that plaintiff may file a motion

18   to amend and proposed amended complaint during the time allotted to file objections to these

19   findings and recommendations, including addressing his failure to do so previously, and how such

20   allegations could establish Constitutional violations.  Moreover, by allowing such a filing the

21   undersigned does not mean to indicate whether or not he will allow such an amendment.

22   Defendant shall not file a response to the motion to amend and proposed amended complaint

23   unless and until ordered by the court.[9]

24   ////

25   _____

26   color of law however, does not rise to the level of a constitutional violation.  Daniels v. Williams,
     474 U.S. 327, 328 (1986).

27
     [9]  It appears that plaintiff's claims against proposed defendants Robinson and Thiel would have
28   the same problems as those against defendant Pomazal addressed above.

                                             21

1    And IT IS HEREBY RECOMMENDED that defendant Pomazal's motion for summary

2 judgment (ECF No. 67) be granted;

3    These findings and recommendations are submitted to the United States District Judge

4 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

5 after being served with these findings and recommendations, any party may file written

6 objections with the court and serve a copy on all parties.  Such a document should be captioned

7 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

8 objections shall be filed and served within fourteen days after service of the objections.  The

9 parties are advised that failure to file objections within the specified time may waive the right to

10 appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

11 Dated:  January 23, 2015

12

13

Fern125.sj(2)

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22